[Docket No. 1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

MARIA E. ROJAS-VELEZ,

     Plaintiff,

        v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Civil No. 16-1324 (RMB)

**MEMORANDUM OPINION & ORDER**

**BUMB,** UNITED STATES DISTRICT JUDGE:

    This matter comes before the Court upon the appeal by
Plaintiff Maria E. Rojas-Velez (the "Plaintiff") of the final
determination of the Commissioner of Social Security (the
"Commissioner") denying Plaintiff's application for social
security benefits [Docket No. 1].  For the reasons set forth
below, the Court **VACATES** the decision of the Administrative Law
Judge (the "ALJ") and **REMANDS** for further proceedings consistent
with this Memorandum Opinion and Order.

    **I.  STANDARD OF REVIEW**

    A reviewing court must uphold the Commissioner's factual
findings if they are supported by "substantial evidence," even
if the court "would have decided the inquiry differently."
<u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001); <u>Knepp v.</u>

1

Apfel, 204 F.3d 78, 83 (3d Cir. 2000); see also 42 U.S.C.
§§ 405(g), 1383(c)(3).  "'Substantial evidence' has been defined
as 'more than a mere scintilla.  It means such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'"  Dellapolla v. Comm'r of Soc. Sec., 662 F. App'x
158, 160 (3d Cir. 2016) (quoting Smith v. Califano, 637 F.2d
968, 970 (3d Cir. 1981) (quoting Richardson v. Perales, 402 U.S.
389, 401 (1971))).  Where the evidence is susceptible to "more
than one rational interpretation, the Commissioner's conclusion
must be upheld."  Ahearn v. Comm'r of Soc. Sec., 165 F. App'x
212, 215 (3d Cir. 2006) (citing Monsour Med. Ctr. v. Heckler,
806 F.2d 1185, 1190-91 (3d Cir. 1986)); see also New Jersey Bd.
of Pub. Utilities v. F.E.R.C., 744 F.3d 74, 94 (3d Cir. 2014).

     In addition to the "substantial evidence" inquiry, the
reviewing court must also determine whether the ALJ applied the
correct legal standards.  See Mitton v. Comm'r of Soc. Sec.,
--- F. App'x ----, 2016 WL 6933937, at *1 (3d Cir. Nov. 28,
2016); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  The
Court's review of legal issues is plenary.  Mitton, 2016 WL
6933937, at *1 (citing Hagans v. Comm'r of Soc. Sec., 694 F.3d
287, 292 (3d Cir. 2012)); Sykes, 228 F.3d at 262 (citing
Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir.
1999)).

## "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act further states that:

> [A]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The Third Circuit has described the Commissioner's inquiry at each step of this analysis, as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that [her] impairments are "severe," [she] is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform [her] past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to [her] past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume [her] former occupation, the evaluation moves to the final step.

At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether [she] is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.

II.   **FACTUAL AND PROCEDURAL BACKGROUND**

The Court recites only the facts that are necessary to its determination on appeal, which is limited to Plaintiff's mental impairments.

### A. Medical History

In or around September 2011, Plaintiff began mental health treatment at Nueva Vida Behavioral Health Center, where she met regularly with therapist Gregorio Castro.  On September 30, 2011, Mr. Castro completed a Biopsychosocial Assessment regarding Plaintiff.  According to this assessment, Plaintiff reported that she left work due to back pain and had difficulty sleeping.  Mr. Castro noted that Plaintiff presented with depression and suicidal ideas.  Administrative Record ("R.") 325-26.  His diagnostic impressions include recurrent major depressive disorder, anxiety, and a GAF score of 50.  R. 329.

Plaintiff participated in individual therapy sessions with Mr. Castro from September 2011 through at least January 2014, often at least once a week.  Mr. Castro's notes from September and October 2011 reflect that Plaintiff was depressed and anxious and that Plaintiff suffered from suicidal ideas and decreased energy and motivation.  R. 352-58.  Plaintiff also had difficulty sleeping and was frustrated by her financial and family situations.  R. 353-55.  Plaintiff continued to report depression and trouble sleeping in November 2011.  R. 347,

350-51.  In December 2011, Mr. Castro noted that Plaintiff was anxious due to economic problems and that she reported sleeping poorly and becoming angry easily.  R. 346.  Mr. Castro also noted that Plaintiff was anxious, had low energy, and that she missed her family around the holidays.  R. 343-45.

In February 2012, Plaintiff repeatedly reported during her therapy sessions that she was not sleeping well, had negative thoughts, and was depressed.  R. 341-42.  Plaintiff reportedly felt overwhelmed, anxious, and hopeless.  R. 337-40.  In March 2012, Plaintiff continued to feel anxious, depressed, overwhelmed, and tired.  R. 331-35.

Beginning in March 2012, Plaintiff also began seeing Dr. Lyda Monte, a psychiatrist at Nueva Vida, on a monthly basis.  On March 2, 2012, Dr. Monte completed an Adult Psychiatric Evaluation regarding Plaintiff.  Dr. Monte reported that Plaintiff suffered from moderate depressed mood, anxiety, and low energy, and that Plaintiff slept poorly.  She noted that Plaintiff's present illness began when her mother died in 2010. Dr. Monte diagnosed Plaintiff with schizoaffective disorder, PTSD, asthma, osteoporosis, and arthritis, and assigned Plaintiff a GAF score of 50.  R. 317-19.  At the following session, in April 2012, Dr. Monte noted "sleep good/+ voices" and noted that Plaintiff's mood was depressed.  R. 447.

In July and August 2012, Plaintiff's therapist, Mr. Castro, noted that Plaintiff was depressed, overwhelmed, and frequently had low energy.  R. 437-43.  At times, Plaintiff cried during their sessions.  R. 436, 439.  Mr. Castro also noted that Plaintiff had poor concentration.  R. 435.

Mr. Castro's progress notes from November and December 2012 indicate that Plaintiff continued to be anxious, depressed, and lonely.  R. 430, 433-34.  Mr. Castro also noted that Plaintiff did not pay attention to details and that she often misplaced items.  R. 430-32.  He reported that Plaintiff had difficulty remembering past events and that she was disorganized.  R. 429. In January 2013, Mr. Castro noted again that Plaintiff had difficulty concentrating, remembering and making decisions, and that Plaintiff was anxious and worried.  R. 425-26.  Plaintiff continued to feel depressed, tired, and overwhelmed.  R. 422-24. In February 2013, Mr. Castro noted that Plaintiff was stressed because of her family.  R. 419-20.  Dr. Monte also noted increased depression in February 2013.  R. 445.  In March 2013, Mr. Castro once again reported that Plaintiff had difficulty remembering recent information and was highly distracted and impulsive.  R. 414.  Plaintiff also reported feeling anxious, irritable, depressed, and tired.  R. 413, 418.  In both March and April 2013, Dr. Monte documented decreased depression and good sleep.  R. 444-45.  In the following months, Mr. Castro

noted that Plaintiff continued to display low energy, lack of concentration, and anxiety.  Plaintiff also reported feeling isolated and disappointed.  R. 407-11.  In May 2013, Dr. Monte once again noted decreased depression and better sleep.  R. 444.

On June 13, 2013, Dr. Monte completed a Mental Residual Functional Capacity Form on Plaintiff's behalf.  Dr. Monte reported that Plaintiff's impairments preclude performance of the following tasks for 5% of an 8 hour workday: understanding, remembering, and carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. R. 404-06.

In June and July 2013, Mr. Castro's progress notes indicate that Plaintiff felt overwhelmed, depressed, anxious, and tired. She continued to exhibit decreased energy levels and had difficulty concentrating.  R. 567-71.  In August 2013, during her therapy sessions, Plaintiff reported feeling anxious and unfocused and having difficulty remembering things, paying attention, and following directions.  R. 563-66.  Mr. Castro's progress notes from September 2013 reflect that Plaintiff

suffered from anxiety and that Plaintiff felt overwhelmed and upset. R. 558, 562. Mr. Castro continued to report that Plaintiff was angry, stressed, and depressed in the following months. R. 557-58.

### B. Function Reports

Plaintiff and her daughter also completed Function Reports regarding Plaintiff's activities of daily living. In her February 24, 2012 Function Report, Plaintiff reported that she had difficulty getting up and that she required her daughter's assistance with most daily activities due to her severe pain. R. 231-32. She also noted that she often does not remember to take her medications without assistance and that she does not follow written or spoken instructions well. R. 233-36. Plaintiff's adult daughter completed a Third Party Function Report on February 24, 2012, in which she explained that she must assist Plaintiff with most activities of daily life due to Plaintiff's significant pain. R. 239. She also noted that Plaintiff frequently forgets to take her medications and is "very forgetful". R. 241-42. Plaintiff's daughter reported that Plaintiff does not follow spoken instructions or changes in routine "well at all." R. 244-45. On July 28, 2012, Plaintiff's daughter completed a second Third Party Function Report, in which she noted that Plaintiff does not have any

problems with personal care, but requires assistance with and reminders to take her medications.  R. 255-62.

### C. Consultative Examinations

In 2012 and 2014, Plaintiff underwent several consultative examinations in connection with her applications for social security benefits.  On May 14, 2012, Dr. Robert Waters conducted a mental status examination of Plaintiff.  Dr. Waters noted that Plaintiff reported depression and anxiety and that Plaintiff needed instructions repeated often, but could perform 3-step directions.  Dr. Waters reported that Plaintiff displayed some anxiety during the examination.  R. 362-64.  His diagnostic impressions were major depressive disorder, recurrent, severe with psychotic features, chronic/severe lower and upper back pain, two herniated discs, asthma, and arthritis.  R. 364. Finally, Dr. Waters opined that Plaintiff's "severe limitations are due to her physical status and mental status.  The combination of her physical/medical conditions and her depression and anxiety symptomatology, present her most significant obstacles to adapting to a typical work environment."  R. 364.  Thereafter, on May 24, 2012, Dr. Ronald Bagner physically examined Plaintiff and noted that Plaintiff reported depression, as well as pain in the cervical area, back, arms, and legs.  R. 366-67.

On January 9, 2014, Dr. Young B. Lee conducted a mental status examination of Plaintiff.  Dr. Lee noted that Plaintiff's mood was moderately depressed and that her response time was extremely slow.  In assessing the severity of Plaintiff's mental impairments, Dr. Lee reported: "Psychiatric examination showed signs of mild degree of affective disorder.  No thinking disorder noted.  She is able to follow directions.  She is able to maintain meaningful conversations.  Her interpersonal relationship is limited.  Her psychiatric impairment appears to be mild-to-moderate."  R. 577.  Dr. Lee found that Plaintiff suffered from depressive disorder and "probably low intellectual functioning."  R. 577.

On June 4, 2014, Plaintiff was psychologically evaluated by Dr. Kenneth Goldberg, who administered a WAIS-IV examination. The examination revealed that Plaintiff's full-scale IQ is 61, which is below the bottom first percentile rank.  R. 584. Dr. Goldberg opined that Plaintiff "is a woman who appears to have suffered both mental and physical pain over the course of her life.  She was referred for an IQ test.  She tests in the range of mild mental disability."  R. 585.

### D. Application for Social Security Benefits

On or about February 16, 2012, Plaintiff filed applications for social security disability benefits and supplemental security income, alleging an onset date of June 1, 2010.

R. 194-207.  The claims were denied initially on July 2, 2012,
and upon reconsideration on November 13, 2012.  R. 125-30,
139-44.  Thereafter, on December 13, 2012, Plaintiff requested a
hearing before an ALJ.  R. 145-49.  On December 17, 2013, ALJ
Mark G. Barrett held a hearing, at which Plaintiff appeared with
her attorney, Alan Polonsky, Esq., and a Spanish-language
interpreter, and provided testimony.  No vocational expert
testimony was provided.  R. 37-62.  The ALJ issued an
unfavorable decision on September 23, 2014.  R. 19-32.  On
February 12, 2016, the Appeals Council denied Plaintiff's
request for review of the ALJ's decision, making the ALJ's
decision the final determination of the Commissioner.  R. 1-7.

### III.   THE ALJ'S DETERMINATION

On September 23, 2014, the ALJ determined that Plaintiff
was not disabled under the Social Security Act from the alleged
onset date through the date of the ALJ's decision.  R. 19-32.

At Step One, the ALJ determined that Plaintiff had not
engaged in substantial gainful activity since her alleged onset
date of June 1, 2010.  R. 21.  At Step Two, the ALJ determined
that Plaintiff suffered from the following severe impairments:
arthralgia, major depressive disorder, anxiety disorder, and
intellectual disability.  R. 21.  The ALJ further found that
Plaintiff's asthma and chronic sinusitis were not severe
impairments.  R. 22.  At Step Three, the ALJ determined that

Plaintiff did not have an impairment or combination of
impairments that meets or medically equals one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In
making this determination, the ALJ considered Listings 1.02,
1.04, 12.04, 12.05, and 12.06.  R. 22-24.

Before turning to Step Four, the ALJ assessed Plaintiff's
Residual Functional Capacity ("RFC") and determined that:

> After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual
> functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b), except she can never
> climb ladders, ropes or scaffolds; she can frequently
> balance; she can occasionally climb stairs, balance,
> stoop, kneel, crouch, or crawl; she must avoid
> concentrated exposure to hazards, such as unprotected
> heights and moving mechanical parts; and she is limited
> to unskilled work, involving simple, repetitive tasks
> and one to two step instructions.

R. 24.  Then, at Step Four, the ALJ determined that Plaintiff
had no past relevant work.  R. 31.

Finally, at Step Five, the ALJ concluded that Plaintiff was
not disabled because there are jobs in the national economy that
Plaintiff can perform.  R. 31-32.  The ALJ relied upon Medical
Vocational Rule 202.20, 20 CFR Part 404, Subpart P, Appendix 2,
as a framework.  The ALJ reasoned as follows:

> When the claimant cannot perform substantially all of
> the exertional demands of work at a given level of
> exertion and/or has nonexertional limitations, the
> medical-vocational rules are used as a framework for
> decisionmaking unless there is a rule that directs a
> conclusion of "disabled" without considering the
> additional exertional and/or nonexertional limitations

(SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20.  However, the additional limitations have little or no effect on the occupational base of unskilled light work.  Social Security Regulations state that limitations on the ability to climb ladders, ropes or scaffolds, crawl, stoop, crouch, kneel, and be exposed to unprotected heights and moving machinery do not significantly erode the occupational base for light work (SSR's 85-15, 83-14).

Additionally, the Medical-Vocational Guidelines state that the functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.  Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy.  These jobs can be performed after a short demonstration or within 30 days, and do not require special skills or experience.  The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competences for unskilled work.

The undersigned finds that claimant's limitation for unskilled work has no effect on claimant's occupational base, as the Medical-Vocational Guidelines represent solely unskilled jobs.

R. 31-32.  The ALJ did not consider any vocational expert testimony or other similar evidence at this step.

IV.   **ANALYSIS**

On appeal, Plaintiff raises three issues.  First, Plaintiff contends that the ALJ erred at Step Three by failing to properly consider Listing 12.05C and improperly concluding that there was no evidence that Plaintiff's mental impairment developed prior to age 22.  Next, Plaintiff argues that the ALJ's RFC determination did not properly account for Dr. Goldberg's opinions, including the IQ test results.  Finally, Plaintiff claims that the ALJ's reliance on the Medical-Vocational Guidelines without vocational testimony or other similar evidence to find Plaintiff not disabled at Step Five was improper and not supported by substantial evidence.  The Court addresses each argument in sequence.

## A. <u>Step Three: Listing Level 12.05C</u>

At Step Three of the sequential analysis, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  "For a claimant to show [her] impairment matches a listing, it must meet <u>all</u> of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Jones v. Barnhart</u>, 364 F.3d 501, 504 (3d Cir. 2004) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990)) (emphasis in original).  If a

claimant's impairments meet or medically equal one of the listed
impairments, the ALJ must find the claimant to be disabled.  On
the other hand, if the claimant's impairments do not meet or
medically equal a listing level impairment, the analysis
proceeds to the RFC determination and then Step Four.

Plaintiff argues that the ALJ's determination at Step Three
is not supported by substantial evidence because the ALJ did not
adequately evaluate Listing 12.05C.  Specifically, Plaintiff
claims that the ALJ "summarily concluded, against good reason
and Social Security regulations, that there was no evidence of
an intellectual disability with an onset prior to the
Plaintiff's attainment of age twenty-two (22)," as required to
meet Listing 12.05C.  Pl. Br. at 16 [Docket No. 8].

Listing 12.05C provides as follows:

> Intellectual disability: Intellectual disability refers
> to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning
> initially manifested during the developmental period;
> i.e., the evidence demonstrates or supports onset of the
> impairment before age 22.  The required level of severity
> for this disorder is met when the requirements in A, B,
> C, or D are satisfied. . . . C. A valid verbal,
> performance, or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an
> additional and significant work-related limitation of
> function . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found, in relevant part, that Plaintiff did not
satisfy the criteria of Listing 12.05 because "Claimant was

42 years old on the alleged onset date.   There is no evidence of
an intellectual disability with an onset prior to her attainment
of age 22."   R. 24.   Plaintiff does not genuinely dispute that
there is no evidence that demonstrates or supports the onset of
her impairment before age 22.   Instead, Plaintiff contends that
the ALJ should have assumed that Plaintiff's IQ has been
constant since age 16, pursuant "Social Security policy" set
forth in Listing 112.00D(10).   Pl. Br. at 16–17.   This section,
however, is irrelevant to Plaintiff's case as it addresses
mental disorders and intellectual disability in children under
age 18.   <u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 1,
§ 112.00D(10).[1]

The Third Circuit has rejected a rebuttable presumption
that a current mental impairment existed before age 22.   Indeed,
the Third Circuit has held that the <u>claimant</u> bears the burden of

---

[1] Listing 112.00A states: "Introduction: The structure of
the mental disorders listings for children under age 18
parallels the structure for the mental disorders listing for
adults but is modified to reflect the presentation of mental
disorders in children.   The listing for mental disorders in
children are arranged in 11 diagnostic categories [including]
intellectual disability (112.05)."   Listing 112.00D(10), in
turn, provides: "IQ test results must also be sufficiently
current for accurate assessment under [Listing] 112.05.
Generally, the results of IQ tests tend to stabilize by the age
of 16.   Therefore, IQ tests results obtained at age 16 or older
should be viewed as a valid indication of the <u>child's</u> current
status, provided they are compatible with the <u>child's</u> current
behavior."   20 C.F.R. Part 404, Subpart P, Appendix 1 (emphasis
added).

establishing the existence of an intellectual disability during the developmental period.  Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 652 (3d Cir. 2007) (citing Williams v. Sullivan, 970 F.2d 1178, 1185 (3d Cir. 1992)); Markle v. Barnhart, 324 F.3d 182, 188-89 (3d Cir. 2003).  To satisfy this burden, "it is unnecessary to produce intellectual testing (or other contemporary evidence) prior to age [22].  The claimant need only produce evidence that demonstrates or supports onset of the impairment before age 22."  Cortes, 255 F. App'x at 652-53.

Plaintiff has pointed to no evidence in the record which demonstrates or supports that her intellectual impairments presented prior to age 22.  This Court has scoured the administrative record and finds no such evidence from which the ALJ could have determined that Plaintiff carried her burden of establishing onset of her intellectual disability before age 22. In light of the record, the Court finds that the ALJ's determination at Step Three that Plaintiff does not meet or medically equal Listing 12.05C because "[t]here is no evidence of an intellectual disability with an onset prior to her attainment of age 22" is supported by substantial evidence and shall not be disturbed.

## B. Residual Functional Capacity

Plaintiff also contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ "never

gave proper consideration to the results of the IQ test insofar as he never discussed the results [] of this test or how they relate to the claimant's Residual Functional Capacity." Pl. Br. at 19.

The ALJ noted that Dr. Goldberg administered an IQ test on Plaintiff in June 2014 and summarized Dr. Goldberg's findings, in relevant part, as follows:

> Cognitive testing revealed a verbal comprehension score of 61, working memory of 66, general ability of 63, and full scale IQ of 61, all in the extremely low range of cognitive functioning. Dr. Goldberg found that claimant tested in the range of mild mental disability. He diagnosed claimant with mental disability and depressive disorder, NOS.

R. 29. Additionally, the ALJ noted that "[a]lthough claimant had cognitive testing in the extremely low range of functioning, Dr. Goldberg found only a mild mental disability." Plaintiff argues that, in his RFC determination, the ALJ did not properly evaluate the IQ scores found by Dr. Goldberg. Plaintiff also contends that the ALJ improperly substituted his lay interpretation of "mild" in the context of Dr. Goldberg's finding that Plaintiff suffered from "mild mental disability". Plaintiff explains that "'[m]ild mental disability' does not mean mild in terms of functioning contrary to the Administrative Law Judge's law beliefs," but rather, according to the DSM-IV, indicates significant mental impairment. Pl. Br. at 19-20.

"[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)) (internal quotations omitted); see also Martin v. Comm'r of Soc. Sec., 547 F. App'x 153, 158 (3d Cir. 2013); Guerrero v. Comm'r of Soc. Sec., 2006 WL 1722356, at *3 (D.N.J. June 19, 2006) ("The ALJ's responsibility is to analyze all the evidence and to provide adequate explanations when disregarding portions of it."), aff'd 249 F. App'x 289 (3d Cir. 2007). The Court finds that the ALJ did not explain what, if any, weight he gave to Dr. Goldberg's opinions and findings, especially his finding that Plaintiff had a full-scale IQ score of 61, which was in the bottom 0.5 percentile of the population. R. 584. As a result, it is unclear to this Court whether the non-exertional limitations in the RFC determination were intended to account for Dr. Goldberg's findings or whether the ALJ overlooked those findings in developing the RFC.

Accordingly, remand is necessary for the ALJ to adequately explain the weight given to Dr. Goldberg's opinions and to

incorporate those opinions, as the ALJ deems appropriate, into the RFC determination.  On remand, the ALJ should rely upon competent medical evidence in assessing the severity and implications of <u>mild</u> mental disability, rather his lay interpretation of the word "mild" in this context.  <u>See Morales v. Apfel</u>, 225 F.3d 310, 319 (3d Cir. 2000) ("The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability.").

### C. <u>Step Five: Reliance upon Medical-Vocational Guidelines without Vocational Expert Testimony or Other Similar Evidence</u>

Finally, Plaintiff argues that the ALJ erred at Step Five in relying solely upon the Medical-Vocational Guidelines as a framework to determine non-disability without vocational expert testimony or notice of his intent to rely on a relevant Social Security Ruling ("SSR").  Generally, the claimant has the burden of establishing disability at each step of the sequential process; however, the "Commissioner bears the burden of proof for the last step." <u>Sykes</u>, 228 F.3d at 263 (citing <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n. 5 (1987)).  At the fifth step, the ALJ must demonstrate that the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f).  The ALJ must show that jobs exist in significant numbers in the national economy which the claimant

can perform, consistent with her medical impairments, age, education, past work experience, and RFC.  Id.

To carry the burden at Step Five, the ALJ may utilize the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.  As the Third Circuit has explained, "[t]he grids [in the Medical-Vocational Guidelines] consist of a matrix of four factors--physical ability, age, education, and work experience--and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes, 228 F.3d at 263.  "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guideline direct a conclusion that work exists that the claimant can perform."  Id.

The Third Circuit has also held, however, that where a claimant has both exertional and non-exertional impairments, the ALJ cannot rely upon the grids in the Medical-Vocational Guidelines alone to determine non-disability.  Id. at 273.  The ALJ must also obtain "the testimony of a vocational expert or other similar evidence, such as a learned treatise," in order to carry his burden at the fifth step.  Id.  Alternatively, the ALJ must provide the claimant with notice that he intends to take official notice of the fact that the claimant's non-exertional impairments do not erode the occupational base, and the claimant must have an opportunity to oppose that conclusion.  Id.

22

This principle is also embodied in Social Security Acquiescence Ruling ("AR") 01-1(3), which states that:

> In making a disability determination or decision at step 5 of the sequential evaluation process . . . , we cannot use the grid rules exclusively as a framework for decisionmaking when an individual has a nonexertional limitation(s).  Before denying disability benefits at step five when a claimant has a nonexertional limitation(s), we must:
>
> (1) take or produce vocational evidence such as from a vocational expert, the DOT or other similar evidence (such as a learned treatise); or
>
> (2) provide notice that we intend to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational job base, and allow the claimant the opportunity to respond before we deny the claim.
>
> This Ruling does not apply to claims where we rely on an SSR that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects a claimant's occupational job base.  When we rely on such an SSR to support our finding that jobs exist in the national economy that the claimant can do, we will include a citation to the SSR in our determination or decision.

In Allen v. Barnhart, the Third Circuit clarified that, if the ALJ "wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." 417 F.3d 396, 407 (3d Cir. 2005) (emphasis added).  The Third Circuit further explained that "the claimant should have the opportunity to consider whether it wishes to attempt to undercut

the Commissioner's proffer [of an SSR] by calling claimant's own expert.  Obviously, this requires notice in advance of the hearing."  Id. at 407-08.  Where advance notice is not given, "close scrutiny to the ALJ's reliance on a Ruling as satisfying the Commissioner's burden at Step 5" is required.  Id. at 408.

Here, the ALJ's RFC assessment limited Plaintiff to performing light work, except that she can never climb ladders, ropes or scaffolds; she can frequently balance; she can occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; she must avoid concentrated exposure to hazards; and she is limited to unskilled work involving simple, repetitive tasks and one to two step instructions.  R. 24.

At Step Five, the ALJ reasoned as follows:

If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20.  However, the additional limitations have little or no effect on the occupational base of unskilled light work.  Social Security Regulations state that limitations on the ability to climb ladders, ropes or scaffolds, crawl, stoop, crouch, kneel, and be exposed to unprotected heights and moving machinery do not significantly erode the occupational base for light work (SSR's 85-15 and SSR 83-14).

Additionally, the Medical-Vocational Guidelines state that the functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.  Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy.  These jobs can be performed after a

> short demonstration or within 30 days, and do not require
> special skills or experience.  The functional capacity
> to perform a wide or full range of light work represents
> substantial work capability compatible with making a
> work adjustment to substantial numbers of unskilled jobs
> and, thus, generally provides sufficient occupational
> mobility even for severely impaired individuals who are
> not of advanced age and have sufficient educational
> competences for unskilled work.

R. 31-32.

Plaintiff contends that her restriction to unskilled work involving simple, repetitive tasks and one to two step instructions is a non-exertional limitation that may significantly erode the base of light unskilled work.  In Plaintiff's view, this required the ALJ to obtain vocational expert testimony or other similar evidence or to give her notice of his intention to rely upon an SSR that states that such non-exertional limitations do not erode the occupational base.

Relying on SSR 85-15, the Commissioner argues that the grids take administrative notice of unskilled jobs in the economy and that Plaintiff's non-exertional limitations, i.e. her limitation to unskilled work involving simple, repetitive tasks and one to two step instructions, are encompassed in the limitation to unskilled work.  SSR 85-15 states that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work

situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."

It is not for this Court, however, to determine whether Plaintiff's non-exertional limitations to work involving simple, repetitive tasks and one to two step instructions are or are not coextensive with unskilled work, as defined in SSR 85-15. Rather, this determination should be made by the ALJ, either with the assistance of vocational expert testimony or similar evidence or by proffering an SSR in advance to Plaintiff. Allen, 417 F.3d at 407-08.  In his decision, the ALJ relied upon SSR 85-15 for the proposition that Plaintiff's limitations with regard to climbing, crawling, stooping, crouching, kneeling, and being exposed to heights and machinery did not significantly erode the occupational base for unskilled light work.  R. 31. The ALJ, however, did not rely upon SSR 85-15 in his decision to determine that Plaintiff's restriction to work involving simple, repetitive tasks and one to two step instructions did not erode the base of unskilled light work in the national economy.  In fact, there is no discussion whatsoever of whether or how Plaintiff's restrictions to work involving simple, repetitive tasks and one to two step instructions impacted the occupational

base for light unskilled work, let alone how SSR 85-15 addresses those non-exertional limitations.

This falls short of the Third Circuit's requirement that the ALJ make "crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." See Allen, 417 F.3d at 407. The ALJ should have obtained vocational expert testimony or other similar evidence, or given Plaintiff notice in advance of the hearing that he intended to rely upon SSR 85-15. See, e.g., Meyler v. Comm'r of Soc. Sec., 238 F. App'x 884, 890 (3d Cir. 2007) (remanding, after closely scrutinizing ALJ's reliance on SSR at Step Five, for further elaboration at Step Five where "the ALJ relied upon SSR 85-15 and SSR 83-10 without calling a vocational expert, and without providing advance notice to [plaintiff] so she could call her own vocational expert"); Sykes, 228 F.3d at 273; Allen, 417 F.3d at 407-08; Kuznetsov v. Astrue, 2012 WL 11028, at *8 (W.D. Pa. Jan. 3, 2012) (remanding for reconsideration of Step Five determination and finding that "ALJ's generalized citation to SSR 85-15 will not suffice").

For this reason, the Court finds that the ALJ's determination at Step Five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, relying solely on Medical-Vocational Rule 202.20, is

not supported by substantial evidence.  Remand is, therefore, required for the ALJ to properly evaluate whether jobs exist in the national economy that Plaintiff would be capable of performing, given all of her exertional and non-exertional limitations, as set forth in her RFC.  "This can be accomplished by noting how SSR 85-15 is relevant and controlling--if that is indeed the case--or by obtaining the individualized assessment that SSR 85-15 seems to prefer by way of a vocational expert."  Allen, 417 F.3d at 407.  On remand, if the ALJ chooses to rely upon an SSR once again, advance notice should be given to Plaintiff.  See id. at 407-08 ("urg[ing] that, as a matter of fairness, alerting a claimant to the relevant rule in advance will always be appropriate.").

ACCORDINGLY, FOR THE REASONS SET FORTH ABOVE, IT IS HEREBY, on this **13th** day of **March 2017**,

**ORDERED** that the determination of the Administrative Law Judge is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum Opinion and Order; and it is further

**ORDERED** that the Clerk of the Court shall **CLOSE** the file in the above-captioned matter.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE